The People of the State of New York ex rel. Joshua Bradshaw, Respondent, v. Charles Bidelman, Appellant.

*Application of the Ballot Reform Law — ballots not consecutively numbered — regular ballots not invalidated by the casting of marked ballots — irregularities at a town meeting election.*

In an action in the nature of quo warranto, brought to determine the right of the defendant to the office of town excise commissioner, the trial-court found that the ballots cast for the defendant, who received a majority vote, at a town meeting election held in March, 1892, were properly numbered and indorsed, and that a portion of those cast for the relator were not numbered consecutively so as to correspond with the numbers of the town tickets, and the tickets voted for the defendant, but were of a much higher number. The relator, who was in office at the time of the election, claimed that there was no election and that he held over.

*Held*, that the facts found by the trial court did not invalidate the election; that assuming that the ballots so deposited with high numbers were "marked ballots," they did not operate to render void the ballots that were regular and in accordance with the provisions of the statute.

Although the Ballot Reform Law (Chap 262, Laws of 1890, amended by chap. 296, Laws of 1891), requires ballots to be numbered consecutively, still when ballots, properly indorsed and otherwise regular in form, except that their stubs are not consecutively numbered, have been voted, and the stubs detached, and the ballots cast into the box and their identity lost, there is no provision which prevents their being counted.

At the town meeting in question there were two poll clerks appointed; the town clerk was present and kept the poll list until the two poll clerks were appointed; he then left, but was present at different times during the day and was present and assisted at the canvass of the votes, the poll clerks so appointed kept the poll books, one entered the names of the voters and the number of the town ballots as the same were voted, the other kept the names of the voters and the number of the tickets, and the two books so kept corresponded in names and numbers.. During the meeting the officers did not require all the persons voting to return the tickets not voted by them, and a number of such ballots and pasters were left in the booths.

*Held*, that while the poll list should have been kept by the town clerk, or in his absence by such person as should be chosen by the inspectors present, and the duties of the poll clerks should have been performed by the members of the town board, and the tickets should have been returned to the inspectors, and should have been by them placed in the box kept for such ballots, still the acts above detailed were irregularities merely, not operating to destroy the secrecy of the ballot or affecting the election

Appeal by the defendant, Charles Bidelman, from a judgment of the Supreme Court ousting him from the office of commissioner

of excise of the town of Albion, entered in the office of the clerk of Orleans county on the 9th day of December, 1892, upon a decision rendered upon a trial at the Orleans Circuit by the court (trial by jury having been waived) in an action in the nature of quo warranto brought by the Attorney-General in the name of the People.

*I. S. Signor,* for the appellant.

*C. J. Church,* for the respondent.

Haight, J.:

This action was brought to determine the rights of the defendant to hold and exercise the functions of the office of excise commissioner in the town of Albion, Orleans county.

At the town meeting held in that town on the 8th day of March, 1892, there were cast 637 ballots for the relator and 655 for the defendant. The defendant having received the highest number of votes was declared duly elected by the board of inspectors, and thereupon qualified and entered upon the discharge of the duties of his office.

The trial court found as facts that the ballots cast for the defendant were properly numbered and indorsed, and that at least 100 of the ballots cast for the relator were not numbered consecutively so as to correspond with the numbers of the town tickets and the tickets voted for the defendant, but were of a much larger number. Does this invalidate the election?

Assuming that the ballots so deposited with high numbers are " marked ballots," we do not understand they operated to render void the ballots that were regular and in accordance with the provisions of the statute. Those cast for the defendant were numbered consecutively from one upwards; they were given out by the inspectors and voted in the order in which they were numbered. True, they could be distinguished from those cast for the relator, bearing the higher numbers; so could · every regular ballot be distinguished from the " marked ballots," but the regular ballots are those which conform to the provisions of the statute, whilst the " marked ballots " are those which are prohibited. A marked ballot voted with the intent that it shall afterwards be identified is void and of no effect. So says the statute. To hold that the casting of

such a ballot renders void the regular ballots and invalidates the election would leave it within the power of a few evil-disposed persons to nullify our elections and deprive our citizens of their right of suffrage. In this case it has been found that at least 100 ballots of the character described were cast for the relator, but the principle would have been the same had there been but five or six, or even a less number, and it would thus be made easy to nullify any election. In the case of *The People ex rel. Nichols* v. *The Board of Canvassers of Onondaga County* (129 N. Y. 395), the county clerk had sent the ballots containing the names of candidates nominated by one of the political parties to an election district other than that for which they were numbered, where they were given out by the inspectors of election and voted by the electors. They could be distinguished from the ballots cast by the electors of the other political party. It was held that such ballots should not be counted and that the ballots having the proper numbers and district on them should be.

But we do not understand that the ballots cast for the relator can be thrown out. The stubs having the improper numbers upon the ballots were removed when they were deposited in the ballot box, and there is now no way by which they can be identified. The exact number of such ballots cast is not known; the trial court has found there were 100 or more.

The record does not disclose how the ballots for the relator came to be voted in the way stated. It is suggested that they were first given out to the voters in the regular order as the voters called for them, numbered from the unit upwards, and that thereafter, for the space of about an hour, the ballots containing the name of the relator were delivered to the voters bearing much higher numbers. The trial court has found, however, that the board of inspectors acted in good faith and without fraudulent intent. It must be conceded that the ballots deposited by the voters for the relator during the time referred to, containing the high numbers, could readily be distinguished from those deposited for the defendant which contained the low numbers, and to that extent the secrecy of the ballot was destroyed. The statute provides that " No inspector of election shall deposit in a ballot box, or permit any other person to deposit in a ballot box, on election day any ballot which is not properly

indorsed and numbered." And further, " No ballot that has not the printed official indorsement shall be counted, except such as are voted in accordance with the provisions of Section 21 of this Act. All ballots that are ' defective ' shall be preserved and filed, as provided for in Section 27 of this Act." (Laws of 1890, chap. 262, §§ 29–31, as amended by Laws of 1891, chap. 296.)

By other provisions of the act the number is required to be printed upon the back of the stub, and the inspectors, after a ballot is returned to them by the voter, are required to remove the stub before placing it in the box. It will thus be seen that after the ballot is placed in the box there is no way to identify it or to determine whether it did or did not have a stub with an improper number upon it. The statute, as we have seen, prohibits the inspectors from depositing a ballot in the box which is not properly numbered. Another provision of the statute makes it a misdemeanor, punishable by a fine and imprisonment, for every officer who violates this statute. But we find no provision which prohibits the counting of such a ballot when once in the box, where its identity is lost.

The indorsement is required to be printed upon the back of the ballot and not upon the stub. The indorsement remains after the stub is removed, and if an improper one, it serves to identify the ballot when taken from the box, hence the provisions that " no ballot that has not the printed official indorsement shall be counted, etc." (§ 31.) But this provision has no application to the numbers upon the stub.

It is contended that the statute does not require the ballots to be numbered from one upwards, and that for that reason the ballots cast having the high numbers upon them were regular. True, the statute does not in terms so provide. But it does provide that they shall be consecutively numbered. We think that it was intended that the ballots should be numbered from the unit upwards; that such is a fair and reasonable construction of the statute; but if this were not so, they are to be numbered consecutively, and this would not permit the commencement of the numbering at the unit and after a few numbers skip to 900, or some other higher number.

There are some irregularities in the proceedings of the town board, acting as inspectors of election, at the town meeting in question. There were two poll clerks appointed; the town clerk was

present at the meeting and kept the poll list until the two poll clerks were appointed; he then left, but was present at different times during the day, and was present and assisted at the canvass of the votes. The poll clerks so appointed kept the poll books; one entered the names of the voters and the number of the town ballots as the same were voted; the other kept the names of the voters and the number of the tickets, and the two books so kept corresponded with names and numbers. The poll list should have been kept by the town clerk, or, in his absence, by such person as should be chosen by the inspectors present, and the duties of the poll clerks should have been performed by members of the town board. During the meeting, the officers did not require all the persons voting to return the tickets not voted by them, and a number of such ballots and pasters were left in the booths. The tickets should have been returned to the inspectors and by them placed in the box kept for such ballots. But these we regard as irregularities merely, not operating to destroy the secrecy of the ballot or affecting the election. (*People* v. *Cook*, 14 Barb. 259; affd., 8 N. Y. 67; *People ex rel. Noyes* v. *Board of Canvassers of Chemung County*, 126 id. 392.)

The trial court found that the relator was elected commissioner for the town in 1889 for three years, and entered upon the duties of his office and continued to exercise such duties until the town meeting in question; that the defendant was not elected, and that the relator holds over and is entitled to act as commissioner of excise.

Under the view taken by us the defendant was duly elected commissioner of excise, and it, therefore, becomes unnecessary to consider the question as to whether the relator would hold over in case there was no election.

The judgment should be reversed and a new trial ordered, costs to abide event.

DWIGHT, P. J., LEWIS and MACOMBER, JJ., concurred.

Judgment appealed from reversed and new trial granted, costs to abide the event.